JENNA A. PEHRIZ,

Plaintiff,

Case No. 4:13-00654-CV-W-HFS

v.

THE KANSAS CITY BOARD OF
POLICE COMMISSIONERS, et al.

Defendants.

## MEMORANDUM AND ORDER

Presently pending before the court is the motion of attorney, Dion F. Sankar, to withdraw as counsel of plaintiffs. (doc. 115).[1] Also pending, is a motion for summary judgment filed by defendants the Kansas City Board of Police Commissioners, Tom Stonfer, Jackie Baker, and Natalie Cofield-Booker (doc. 131), as well as defendants' motion for an extension of time to file a reply brief. (doc. 137).

<u>Factual and Procedure Background</u>

At approximately 11:00 p.m. on July 27, 2012, plaintiff, accompanied by her husband Gokhan, her sister Katherine Roewert, and a friend Daniel Webb, went to Angel's Rock Bar in the Power & Light District "P&L" in Kansas City, Missouri. (Second Amended Complaint: ¶¶ 26-29). At approximately 1:00 a.m. the following morning, plaintiff and her party departed Angel's Rock Bar and entered the Shark Bar. (Id: ¶ 30). Plaintiff and her party ordered and paid for drinks which arrived about 1:45 a.m., and shortly thereafter they were told they must dispose their drinks and exit the premises. (Id: ¶¶ 32-33). An argument ensued between plaintiff's party

---

[1] Attorney Sankar states that attorneys Brian F. McCallister and Cynthia L. Short, of the McCallister Law Firm will continue representation of plaintiff. Thus, the motion to withdraw will be granted.

and staff at the Shark Bar and as plaintiff exited the bar she knocked over a garbage can. (Id: ¶ 34).

P&L security officer Samantha Meyers arrived and restrained plaintiff, using handcuffs, and escorted her to a holding area. (Id: ¶¶ 35-37). Plaintiff estimates that she arrived at the holding area at approximately 2:00 a.m. and was handcuffed to a wall. (Id: ¶¶ 39-40). Plaintiff states that she requested a glass of water and to use the restroom, but was refused; and she soiled her clothing. (Id: ¶¶ 45-46).

At approximately 3:00 a.m., the restraints were removed and plaintiff was advised that she was barred from the P&L facility for one year. (Id: ¶ 47). As she was leaving, plaintiff knocked over a plastic cup containing water onto the floor and was again restrained by Meyers who turned plaintiff over to defendant Kansas City Missouri Police Officer Tom Stonfer. (Id: ¶¶ 48-52). Meyers advised Stonfer that plaintiff threw a cup of ice water at her. (Id: ¶ 53). Stonfer advised plaintiff that she was being arrested for assault and plaintiff was transported to the jail located at 1125 Locust Street, Kansas City Missouri. (Id: ¶¶ 54-56).

Upon arrival at the jail, Jacqueline Baker, a detention facility officer, took plaintiff down a hallway which had a glass window into an adjacent room. (Id: ¶¶ 67, 69). Plaintiff states that the hallway was also being traversed by two male police officers and a male custodian, and that while in their presence, her head and body were pushed against the wall near the window while she was stripped and forced to change clothes.. (Id: ¶¶ 69-73). Plaintiff states that neither Baker nor Natalie Cofield-Booker, a detention facility officer, gave any verbal commands designed to search her person, and neither searched or attempted to visually observe her body for the presence of scars or tattoos. (Id: ¶¶ 74-77). Plaintiff was clothed in jail-issued pants, top and slippers, and placed in a "bullpen" cell area. (Id: ¶ 85).

At approximately 7:00 a.m. on July 28, 2012, plaintiff was released after her husband paid the $500.00 bond. (Id: ¶ 89). She was charged with a municipal violation; but, all charges related to the violation were subsequently dismissed. (Id: ¶¶ 90-91).

Plaintiff commenced this action asserting claims against various defendants[2]; the still remaining claims have been asserted against the Board of Police Commissioners, Police OfficerTom Stonfer, and detention facility officers Jacqueline Baker, and Natalie Cofield-Booker. In a second amended complaint, plaintiff alleges the following claims under 42 U.S.C. § 1983: Count II – malicious prosecution, false arrest, and wrongful imprisonment against the Board and Stonfer; Count III – conspiracy against the Board, Stonfer, Baker, and Cofield-Booker; Count IV – illegal stripping and search against the Board, Baker, and Cofield-Booker;[3] Count V – policies and practices of the Board. Plaintiff alleges state law claims in VI for malicious prosecution, abuse of process, false arrest and false imprisonment; Count VII for excessive force, and assault and battery; Count VIII for invasion of privacy; Count IX for illegal strip search; and Count X for intentional infliction of emotional distress.

Discussion

Summary Judgment

Summary judgment is only appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Peters v. Woodbury County, Iowa, 979 F.Supp.2d 901, 926 (N.D. Iowa 2013); citing, Fed.R.Civ.P. 56 (c).

---

[2] On Jan. 21, 2014, plaintiff voluntarily dismissed the claims asserted against Entertainment Holdings, LLC f/k/a Entertainment Concepts Investors, LLC. (doc. 54). On Feb. 21, 2014, plaintiff voluntarily dismissed the claims asserted against Kansas Power & Light. (doc. 60).On May 1, 2014, the parties filed a stipulation dismissing plaintiff's claims against Cordish Companies Inc. (doc. 79). On July 21, 2014, the parties filed a stipulation dismissing plaintiff's claims against First Response Inc. and Samantha Myers. (doc. 94).
[3] Perhaps due to inadvertent error, plaintiff does not assert any claims under Count V.

In ruling on a motion for summary judgment, the facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. Id. Credibility determinations, weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Id. The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Id. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Id. Summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. Id.

Qualified Immunity

Defendants seek summary judgment on the basis of qualified immunity as to plaintiff's claim of a § 1983 violation due to an illegal strip search. The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Peters, 979 F.Supp.2d, at 926; citing, Pearson v. Callahan, 555 U.S. 223, 231 (2009). When properly applied, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law Peters, at 927; citing, Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2085 (2011), and the doctrine allows officers to make reasonable errors so that they do not always err on the side of caution for fear of being sued. Id, citing, Amrine v. Brooks, 522 F.3d 823, 831 (8th Cir. 2008). Further, qualified immunity is an immunity from suit rather than a mere defense to liability, so that it is effectively lost if a case is erroneously permitted to go to trial. Id.

In evaluating a claim of qualified immunity a two-step inquiry is required: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2)

4

whether that right was clearly established at the time of the defendant's alleged misconduct. Peters, at 927. The Eighth Circuit has explained the "clearly established law" prong as where an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff. Id, at 928; citing, Gordon ex rel. Gordon v. Frank, 454 F.3d 858, 862 (8th Cir. 2006). [4]

The official is entitled to qualified immunity unless the answer to both of these questions is yes. Id. However, if the allegations and undisputed facts do not amount to a constitutional violation, there is no necessity for further inquiries concerning qualified immunity. Id.

## I. Section 1983 Claims

Section 1983 only provides a remedy for violations of rights expressly secured by federal statutes or the Constitution. Kurtz v. City of Shrewsbury, 245 F.3d 753, 758 (8th Cir. 2001). In her second amended complaint, plaintiff asserts several claims under 42 U.S.C. § 1983. Count II includes allegations for malicious prosecution, false arrest, and wrongful imprisonment; Count III alleges a claim of conspiracy; Count IV alleges illegal strip search; and Count V alleges violative policies, practices, and procedures. Where related, claims asserted under state law will be reviewed simultaneously with the federal claims raised in violation of this statute.

A.     Illegal Strip Search

Plaintiff alleges in Count IV that the Board, Baker, and Cofield-Booker violated her Fourth Amendment right to be free from unreasonable searches and seizures when they detained and searched her at the jail. (Second Amended Complaint: ¶ 119). Plaintiff asserts a constitutional right of privacy against unreasonable searches of her body and/or intrusion of her personal privacy. (Id: ¶ 120). And, she alleges that the defendant officers, Baker and Cofield-

---

[4] Sisney v. Reisch, 674 F.3d 839, 847 (8th Cir. 2012)(officials receive qualified immunity if they lacked fair notice that their actions were unlawful); see also, Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004)(officials are not liable for bad guesses in gray areas, they are liable for transgressing bright lines).

Booker, did not have probable cause, reasonable suspicion or any particularized suspicion that she had committed a felony offense or possessed a weapon or drugs. (Id: ¶ 121).

Plaintiff claims that the removal of her clothing by the detention officers constituted a strip search within the meaning of both Missouri statute, § 544.193.1(2) RSMo, and federal law. According to plaintiff, when she removed her clothes at their command, or when her clothes were forcibly removed by the officers, the intent was to visually inspect her breasts and buttocks. Defendants argue that once plaintiff urinated on herself it was determined that the urine seeped through her blue jeans to the bottom of her shirt, and that as plaintiff removed the shirt over her head, it was likely that her bra became contaminated with the urine. (Supporting Suggestions to Summary Judgment: pg. 13). Defendants contend that the jail has a legitimate penological interest in maintaining a sanitary facility and that Detention Policy 150 required that under such circumstances the clothing be removed for sanitary purposes. (Id: pgs. 13-14). Defendants further contend that the clothing exchange lasted three minutes and took place in the female hallway which had only one entrance and which was blocked by the female detention officers to prevent access by any male staff or detainees. (Id: pg. 14).

Viewing plaintiff's allegations in the light most favorable to her, a question arises as to whether plaintiff was subjected to a strip search, or, as contended by defendants, a clothing exchange. In Peters v. Woodbury County, Iowa, 979 F.Supp.2d 901, 926 (N.D. Iowa 2013), Judge Bennett looked at this issue under circumstances similar to the case at bar. He noted that it is important whether the alleged unconstitutional conduct is defined as a "strip search," or a "search," or merely a "clothing exchange" because it determines the precise content of the Fourth Amendment "reasonableness" inquiry. Id, at 932. In Peters the plaintiff refused to answer suicide questions during the booking process at the county jail, and she was then directed to

remove the swimsuit under her clothing which had strings on it as a safety precaution. 979 F.Supp.2d, at 911-12. The plaintiff refused to remove her clothing and as the situation escalated plaintiff fell or was pushed onto the bed and was restrained by two male officers and one female officer while her clothes were removed and she was dressed in jail attire. Id, at 912-13. The plaintiff filed suit alleging, among other things, that the officers strip searched her without reasonable suspicion and in an unconstitutional manner.

Judge Bennett looked to the Supreme Court for guidance in defining the standard for a "strip search" of an arrestee or pretrial detainee. Peters , 979 F.Supp.2d, at 933; citing, Florence v. Board of Chosen Freeholders of City of Burlington, 132 S.Ct. 1510 (2012). In Florence, the Supreme Court noted that the term is imprecise,[5] and determined that reasonable suspicion is *not always* required to strip search detainees, but only under circumstances not fully clarified by the Court . Peters, at 933; Florence, at 1515.

Upon finding that reasonable suspicion is not always required when a detainee is strip searched, Judge Bennett looked at a recent case from the Second Circuit to determine whether the plaintiff had indeed been subjected to a strip search. Peters, at 934. In Kelsey v. County of Schoharie, 576 F.3d 54 (2nd Cir. 2009), the plaintiff testified that a corrections officer stood in front of him as he removed his street clothes and put on the jail uniform, and that he assumed the officer saw his genitals. Id; citing, Kelsey, at 63. The Kelsey court noted that the plaintiff was not asked to manipulate his body in any way or to assume any particular position, and was able to protect his privacy by turning away from the officer behind a half-wall. Thus, even though the officer briefly saw the plaintiff's genitals, the encounter was not a strip search but rather, was a

---

[5] A "strip search" may refer simply to the instruction to remove clothing while an officer observes from a distance of, say, five feet or more; it may mean a visual inspection from a closer, more uncomfortable distance; it may include directing detainees to shake their heads or to run their hands through their hair to dislodge what might be hidden there; or it may involve instructions to raise arms, to display insteps, to expose the back of the ears, to move or spread the buttocks or genital areas, or to cough in a squatting position. Peters, 979 F.Supp.2d, at 933; citing, Florence, 132 S.Ct., at 1515.

clothing exchange. Id. The Second Circuit held that a strip search is conducted for the <u>purpose</u> of discovering contraband, and involves some level of scrutiny of the detainee's naked body, possibly including inspection of genitals or body cavities, while a "clothing exchange" – which defendants contend occurred in this case - is conducted for the purpose of placing detainees in jail attire and retaining street clothing, and involves only incidental viewing of the detainee's naked body and genitals. <u>Id</u>; <u>citing</u>, <u>Kelsey</u>, at 63-64.  The <u>Kelsey</u> court further noted that the plaintiffs did not claim that they were subjected to visual or manual body cavity searches, and plaintiff Kelsey was not asked to manipulate his body in any way or to assume any particular position. <u>Id</u>. Judge Bennett noted that while under <u>Florence</u>, 132 S.Ct., at 1522-25, a strip search may or may not require reasonable suspicion depending on the circumstances in which it is conducted, reasonable suspicion is not required for a clothing exchange; which instead, is subject to Fourth Amendment reasonableness standards. <u>Peters</u>, at 935; <u>citing</u>, <u>Kelsey</u>, at 65.

Judge Bennett also found that describing the incident in which the plaintiff was stripped as a "strip search" or even as a "search" was at best, misleading, and at worst, an invitation for jurors to decide the case on an improper, emotional basis. <u>Peters</u>, 979 F.Supp.2d, at 939. He therefore declined to refer to the incident as either a strip search or a search, but concluded that the claim asserted in Count IV was properly reviewed as a "violation of privacy rights" protected by the Fourth Amendment or an "intrusion on privacy" in violation of the Fourth Amendment based on an "intrusion" rather than a "search." <u>Id</u>, at 940. I agree, and review of plaintiff's claim of illegal strip search will be reviewed for reasonableness of the officers' actions.

There is no evidence, or reasonable inference, that changing plaintiff's clothing occurred in order to discover contraband. The video provided by plaintiff does not show that she was subjected to either a visual or manual body cavity search or that she was compelled to

8

manipulate her body in any way or forced to assume any particular position. It is undisputed that no one fondled plaintiff's breast, buttocks, genitalia, or any other body parts at any time. (Defendants' Supporting Suggestions: ¶¶ 52-53). In sum, plaintiff has failed to generate any genuine issues of material fact that her clothes were removed for the purpose of inspecting her naked body or genitalia for concealed contraband, rather than for the purpose of changing her into a paper suit issued by the jail. Peters, 979 F.Supp.2d at, 939.


Reasonableness

The Kelsey court also held that reasonable suspicion was not required for a clothing exchange, but rather, was subjected to Fourth Amendment "reasonableness" standards which balance the legitimacy of the goals behind the clothing exchange and the degree of intrusion upon the detainee's privacy. Id; citing, Kelsey, at 64-65 (ultimately concluding that those standards were not violated where only incidental observation of the body of an arrestee occurred during a required clothing exchange). Judge Bennett found the reasonableness analysis consistent with the Supreme Court in Florence, 132 S.Ct. at 1516; citing, Bell v. Wolfish, 441 U.S. 520 (1979) (reasonableness requires assessment of the need for a particular search or intrusion on an inmate's privacy balanced against the resulting invasion of personal rights). Peters, at 935; see also, Stanley v. Henson, 337 F.3d 961, 964 (7th Cir. 2003).

Plaintiff claims that the strip search was unreasonable because there was no justification for initiating the strip search, there was no legitimate penological concern and that the scope and manner in which it was conducted was unreasonable. It has been held that in addressing this type of constitutional claim, courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing that the policies are an unnecessary or unjustified

9

response to problems of institutional security. <u>Beaulieu v. Ludeman</u>, 690 F.3d 1017, 1029 (8th Cir. 2012); <u>citing</u>, <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)(a regulation impinging on an inmate's constitutional rights must be upheld if it is reasonably related to legitimate penological interests) .

Defendants argue that as a penal institution there is a legitimate penalogical reason for them to maintain sanitary conditions for the health and safety of both the detainees and staff. It has been held that the task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials. <u>Beaulieu</u>, 690 F.3d, at 1029, <u>citing</u>, <u>Bell v. Wolfish</u>, 441 U.S. 520, 548 (1979). Maintaining sanitary conditions in a jail falls within a legitimate interest of correction officials. <u>Florence v. Board of Chosen Freeholders of County of Burlington</u>, 132 S.Ct. 1510 (2012). For example, the danger of introducing lice or contagious infections creates numerous risks for facility staff, the existing detainee population, and for a new detainee, and such risk is well documented. <u>Id</u>, at 1518.

Defendants contend that Officers Baker and Cofield-Booker were justified in conducting a clothing exchange and refer to Detention Policy 150 which states that a jail-issued paper suit will be issued to an arrestee when, among other things, the arrestee's clothing is extremely soiled with body excretions. (USMF: ¶ 19, see also, Supporting Suggestions: Exh. E-1). Plaintiff takes issue with the use of the wording "extremely soiled," and claims that jail officers removed soiled clothing regardless of the amount of the stain. Plaintiff appears to argue that the amount of urine is in dispute and that this inconsistency fails to justify a mandated removal of clothing. Notwithstanding plaintiff's present claim that the amount of urine was small and the stain was confined to the crotch area only, she initially stated that while in the P&L Detention Center, she

"soiled her clothing." (Second Amended Complaint: ¶ 46). Her treating psychologist, Dr. Doyle, subsequently testified that his understanding, based on his conversation with plaintiff, was that her underclothing was drenched and/or wet. (Plaintiff's Opposition: Exh. 3, pg. 52). Plaintiff also continues to argue that she was subjected to an intrusive strip search for which there was no justifiable institutional "security" event. Contrary to plaintiff's contentions, there is a legitimate penological interest in maintaining both security *and* sanitary conditions for the safety of both detainees as well as staff.

Officer Baker testified that she observed plaintiff walk to the booking counter wearing a green shirt which was pulled down covering all of her buttocks. (Defendants' Supporting Suggestions: Exh. E, ¶ 10). Officer Baker also testified that after Officer Cofield-Baker advised her that plaintiff had urinated on herself, she observed that plaintiff's blue jeans were wet around the bottom of her buttocks, in addition to the bottom of the blouse covering her buttocks. (Id: ¶¶ 7, 11). Officer Baker concluded that the bottom of plaintiff's shirt became wet with urine when she was seated on her shirt, and that plaintiff's bra would also need to be removed due to likely contamination when plaintiff's blouse touched the bra as she removed it. (Id: ¶¶ 12-14). Officer Baker averred that under Policy 150, bodily excretions on clothing were unsanitary to both the detainees and employees, requiring discretion of the officers as to removal of the clothing. (, ¶¶ 15-17). After viewing the video, Officer Cofield-Booker averred that although she did not have an independent recollection of plaintiff, her practice was to use a red hazmat bag as displayed in the video only for hazardous materials such as clothes with urine. (Id: Exh. F, ¶¶ 6, 15, 19-20). Viewing the record on a whole, there is no genuine dispute that defendants have a legitimate penological interest in maintaining sanitary conditions at the jail for the safety of staff and detainees.

Next, plaintiff contends that the scope of the clothing exchange was unreasonable because the proffered reason of changing urine-stained clothes was a pretense and did not require exposure of her breasts and buttocks. In support of this contention, plaintiff relies on cases inapposite to the circumstances here. For example, in Evans v. Stephens, 407 F.3d 1272 (11Cir. 2005), the search was defined as an "investigatory strip search" and the court held it to be unreasonable because little respect for privacy was observed when each plaintiff was forced to disrobe, ridiculed, and penetrated by an object in front of each other. Id, at 1281. Additionally, the body cavity search was conducted by inserting the same baton-like object into each plaintiff without intervening sanitation. Id. In considering the totality of the circumstances, the court held that the physical force, anal penetration, unsanitariness of the process, terrifying language and lack of privacy collectively established a constitutional violation. Id, at 1282. Similarly inapposite is Jones v. Edwards, 770 F.3d 739, 740 (8th Cir. 1985), where the plaintiff, after arrest for refusal to sign an animal control violation summons, and after becoming loud and verbally abusive, was subjected to a visual inspection of his anal and genital are by a jailer. As noted above, the video submitted by plaintiff fails to show evidence of any type of body-cavity search or inspection.

Even when viewed in a light favorable to plaintiff, the undisputed facts reveal that while in the Power & Light holding area plaintiff urinated on herself and her pants became a little wet. (Defendants' SUMF: ¶¶ 10, 12). It is also uncontroverted that defendant Officers Baker and Cofield-Booker were trained that when an officer can see or feel that a detainee's clothing is wet with even a small amount of blood, urine, or other bodily excretions , the clothes are considered extremely soiled and must be removed for sanitary reasons. (Id: 20). In an affidavit, defendant Officer Baker testified that Officer Cofield-Booker advised her that plaintiff had urinated on

herself, and Officer Baker states that prior to the removal of plaintiff's clothes, she saw and felt that plaintiff's jeans were wet around the bottom of her buttocks and that the bottom of her shirt which was pulled down over her buttocks were also wet. (Id: 22-25; see also Supporting Suggestions, Exh. E, ¶¶11-12). Plaintiff controverts this testimony with Officer Baker's deposition testimony in which she testified that she "saw" the pants were wet as opposed to "saw" and "felt" as averred to in the affidavit. (Opposing Suggestions: ¶ 23). This however, is insufficient to raise a triable issue of material fact that the sanitary policy requiring clothing exchanges was unreasonable. Viewing the evidence here in a light favorable to plaintiff, the sanitary policy is reasonably related to a legitimate security interest.

Here, the undisputed facts reveal that while in the Power & Light holding area plaintiff urinated on herself and her pants became a little wet. (Defendants' SUMF: ¶¶ 10, 12). It is also uncontroverted that defendant Officers Baker and Cofield-Booker were trained that when an officer can see or feel that a detainee's clothing is wet with even a small amount of blood, urine, or other bodily excretions the clothes are considered extremely soiled and must be removed for sanitary reasons. (Id: 20).

Plaintiff also complains that the clothing exchange was unreasonable because her clothes were removed in a place that was open to males who "might come down the same hallway," and her clothes were removed in a forceful manner. As noted above, the video shows plaintiff being escorted by Officers Baker and Cofield-Booker to the end of a hallway, and as plaintiff removed her blouse and bra, Officer Baker shielded her with the jail-issued shirt.  Officer Baker testified that, as trained, she and Officer Cofield-Booker looked at places with a video camera to conduct the clothing exchange.[6] (Defendants' Supporting Suggestions: Exh. E, ¶ 29). Officer Baker stated

---

[6] A video camera allows the officer monitoring the video to call for back-up if a detainee begins to physically fight a jail employee. (Defendants' Supporting Suggestions: Exh. E, ¶ 29).

that other locations were considered such as the general population female cell which housed a video camera, but it held too many detainees and plaintiff was uncomfortable with changing her clothes in front of the other detainees; Cell 206 also had a camera, but it was in use by officers searching a rape suspect. (Id: ¶ 30). The employee bathroom and the kitchen were not appropriate locations due to safety concerns; therefore, the Officers ultimately decided to use the female hallway (with only one entrance that was manned by the Officers) because there were no male cells except one which housed a sleeping female detainee. (Id: ¶¶ 31-33; Exh. F, ¶¶ 12-13). In an attempt to provide as much privacy as possible, Officer Baker allowed plaintiff to stand facing the wall to shield exposure of plaintiff's front side. (Id: Exh. E, ¶ 28(a)). During this time Officer Baker announced to male detention officers that a female clothing exchange was taking place so they would not walk down the hallway; Officer Baker stood to the right of plaintiff to block the view while plaintiff removed her blouse; and she allowed maneuvered the removal process of plaintiff's blouse and bra so that her breasts were not fully exposed. (Id: ¶¶ 28(c-j)). The entire exchange took approximately 3 minutes. (Id: ¶ 28(m)).

According to plaintiff, Officer Healey was only inches from her as she was exposed. Video #7 shows a male officer leave the doorway to a room, presumably Cell 206 where officers were interviewing a rape suspect) to walk near the location where the clothing exchange was occurring. Officer Healy testified and video #7 indicates that he left his post at the doorway of Cell 206 at least twice and stood at the opposite end of the hallway where the clothing exchange took place. (Id: Exh. I, 8(a)). He testified that he did not remove or assist in the removal of plaintiff's clothes, and that he stood at the end of the hallway in the event assistance was needed to detain plaintiff. (Id: ¶ 8(c), 11). Officer Healy's decision to stand-by in view of plaintiff's unruliness was reasonable. Hill v. McKinley, 311 F.3d 899, 903 (8th Cir. 2002) (we cannot say in

14

light of precedent that it is a violation of a prisoner's Fourth Amendment privacy rights for a male guard to require a loud and violent female prisoner to disrobe in his presence before placing her in a padded cell for her safety); see also, Clay v. Woodbury County, Iowa, 982 F.Supp.2d 904, 929 (N.D. Iowa 2013).

The expectations of privacy of an individual taken into police custody necessarily are of a diminished scope. Peters v. Woodbury County, Iowa, 979 F.Supp.2d, at 942; citing, Bell v. Wolfish, 441 U.S., at 557. Both the person and the property in his or her immediate possession may be searched at the station house. Peters, at 942. I find that on this record, no reasonable juror could find that the place where the intrusion took place or the scope of the intrusion was constitutionally unreasonable.

Finally, plaintiff claims that her clothes were removed in an unreasonably forceful manner resulting in her re-living a prior rape. (Plaintiff's opposition: Response to Defendants' SUMF: ¶ 52). Several years after the rape, plaintiff suffered anxiety regarding intimacy and sought treatment from Dr. Doyle.[7] Upon plaintiff's refusal to remove her pants and undergarments at the direction of Officers Baker and Cofield-Booker, the clothing was forcibly removed by the officers. Officer Cofield-Booker stated that as an officer they are trained to turn non-compliant detainees toward a wall, force their head down so that they do not spit, kick, bite or head-butt the officer. (Supporting Suggestions: Exh. F, ¶¶ 17-18). When a detainee is required

---

[7]     Dr. Doyle testified that, after determining there was no physical damage, plaintiff's gynecologist referred her to him in 2010, because plaintiff was experiencing pain with penetration and anxiety around sexual intercourse and intimate relationships. (Plaintiff's Opposition: Exh. 3, pg. 13). At that time, plaintiff was 23 years of age, engaged to her current husband, Gokhan Pehriz, and Dr. Doyle held five sessions with plaintiff and Gokhan because of plaintiff's response or lack of interest in sexual interactions with him. (Id: 14). During the course of therapy, Dr. Doyle discovered that plaintiff was sexually assaulted five years ago, and because plaintiff did not previously speak about the situation, she was anxious. (Id: pgs. 16-17). Dr. Doyle's treatment for plaintiff and Gokhan included talk therapy and coping strategies to help them in their relationship. (Id: pg. 20).

15

to exchange clothing under the Policy, but refuses, their wrists are handcuffed behind their back so that the clothes can be removed by the officer. (Id).

Plaintiff claims that this conduct made her feel "raped." (Plaintiff's Suggestions in Opposition: Exh. 1, pg. 102). In August 2012, after her arrest, plaintiff returned for treatment with Dr. Doyle with feelings of anxiety and discomfort. (Id: pgs. 29-31). Dr. Doyle's opinion based on plaintiff's description of the intrusion was that she felt helpless and a lack of control; specifically due to having a full bladder and unable to use the restroom upon request, culminating in urinating on herself. (Id: pg. 32-33). Dr. Doyle opined that the removal of plaintiff's clothing constituted an assault on her. (Id: pg. 56).

In cases where an arrestee or pre-trial detainee claims excessive force, the Supreme Court has required the application of an objective reasonableness standard when evaluating claims that government agents used excessive force in violation of the Fourth Amendment. Chambers v. Pennycook, 641 F.3d 898, 905 (8th Cir. 2011); citing, Graham v. Connor, 490 U.S. 386, 396 (1989). An officer's use of force violates the Fourth Amendment when it is objectively unreasonable, given the facts and circumstances of the particular case, as judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Chambers, at 905-06; citing, Graham, at 396.

Defendants argue that plaintiff does not allege and the video does not indicate the presence of bruising or any other physical injury. Defendants argue that the degree of the injury –here, contended to be *de minimus*- is relevant as it tends to show the amount and type of force used. That, however, does not end the inquiry as to the reasonableness of alleged force because evidence of only *de minimus* injury does not necessarily foreclose a claim of excessive force

under the Fourth Amendment. <u>Chambers</u>, 906. The degree of injury is certainly relevant insofar as it tends to show the amount and type of force used. <u>Id</u>. However, in properly focusing on the degree of force, it is logically possible to prove an excessive use of force that caused only a minor injury. <u>Id</u>.

As noted above, after determining that plaintiff urinated on herself, Officers Baker and Cofield-Booker determined that plaintiff's pants and underwear should be removed and exchanged for a jail uniform. The officers have testified that in order to maintain sanitary conditions at the facility Policy 150 required this practice be followed. The officers also testified that when a detainee refuses to comply with an order, they are trained to turn the detainee's head away from them to avoid being spit upon or bitten. In the case at bar, when plaintiff refused to remove her pants and underwear, the officers handcuffed plaintiff's wrists behind her back and Officer Cofield-Booker held plaintiff's head against the wall while Officer Baker conducted the exchange of clothing.

Plaintiff states that she refused to remove her pants and underwear because there were other people (specifically, males) in the area. Plaintiff initially stated that her "head and body were forcibly pushed and/or slammed against a wall" (Second Amended Complaint: ¶ 70), and that her "body and head were forcibly pushed into and pressed against the wall." (Id: ¶ 73). Although in later deposition testimony  and the instant pleadings plaintiff argues that her head was "slammed" into the wall, the video provided does not support this rendition. The video shows plaintiff shaking her head in a manner as though saying "no" and the officers then engage in physical contact with plaintiff while handcuffs are engaged and her head is held against the wall.

While there is no evidence of and plaintiff does not allege any physical injury, plaintiff quite possibly suffered a humiliating and demeaning experience during and after her arrest – maybe even sufficiently traumatizing to bring back memories of the prior rape. However, with respect to a claim of excessive force, it has been held that not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. Graham v. Connor, 490 U.S., at 396.[8] Also to be considered, are the legitimate interests stemming from the government's need to manage the facility in which the individual is detained. Kingsley v. Hendrickson, 135 S.Ct. 2466, 2468 (2015) (appropriately referring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security. Id.

Here, no reasonable juror could find that the relatively slight invasiveness of the substantially justified intrusion in this case – which involved no inspection of plaintiff's naked body or genitalia and no probing of her body cavities – was conducted in an objectively unreasonable manner, even though it involved the forcible removal of plaintiff's pants and underwear. In balancing the need for this intrusion –substantially based on sanitary conditions-against the invasion of plaintiff's personal rights, I find that plaintiff has failed to generate genuine issues of material fact that she was subjected to an unconstitutional strip search under § 1983.

I conclude that plaintiff has failed to allege facts sufficient to establish a constitutional violation. In so deciding, there is no necessity for further inquiry concerning qualified immunity. Peters, 979 F.Supp.2d, at 927-28; see also, Habhab v. Hon, 536 F.3d 963, 969 (8th Cir. 2008); citing, Saucier v. Katz, 533 U.S. 194, 201 (2001). In any event, plaintiff has also failed to generate genuine issues of material fact that the absolute right that she purports to have been

---

[8] Similarly, the situation described is not one where the Constitution requires perfect privacy.

violated was clearly established. Clay v. Woodbury County, Iowa, 982 F.Supp.2d 904, 928 (N.D.Iowa 2013). Therefore, defendants are entitled to summary judgment on the basis of qualified immunity on plaintiff's claim in Count IV of illegal strip search.

In the absence of unreasonableness, summary judgment is also granted as to plaintiff's claim in Count VIII for invasion of privacy under Missouri common law. The Restatement of Torts (Second) § 652A (1977) declares that the right of privacy is invaded when there is, among other things, unreasonable intrusion upon the seclusion of another. Sofka v. Thai, 662 S.W.2d 502, 510 (Mo. banc 1983). Similarly, in the absence of any genuine issue of material fact on the question of the reasonableness of the intrusion, plaintiff's state law claim in Count VII for excessive force also fails. Healy v. City of Brentwood, 649 S.W.2d 916, 918 (Mo.Ct.App. 1983)(a police officer may use such means or force as is reasonably necessary in the circumstance to accomplish an arrest).

Because there is no evidence that Officers Baker and Cofield-Booker used more force than was reasonably necessary in removing plaintiff's clothing, summary judgment is granted. Holtgreven v. O'Fallon Police Dept., 2009 WL 2032164 *11 (E.D.Mo. 2009).

B. Malicious Prosecution, False Arrest, and Wrongful Imprisonment

In Count II, plaintiff asserts claims under § 1983 for malicious prosecution, false arrest, and wrongful imprisonment against Police Officer Thomas L. Stonfer and the Board. Assuming false imprisonment is cognizable under § 1983, to state such a claim, a plaintiff must demonstrate the elements of a common law claim, and show that his Fourth Amendment right to be free from unreasonable search and seizure has been violated. Pitts v. City of Cuba, 913 F.Supp.2d 688, 731-32 (E.D.Mo. 2012). Probable cause is a complete defense to a false imprisonment claim, whether brought under § 1983 or under Missouri law. Pitts, at 732. So, too,

a false arrest claim under § 1983 fails as a matter of law where the officer had probable cause to make the arrest. Id.

Plaintiff claims that Officer Stonfer did not see the alleged criminal conduct and it was not reported to him; thus, he did not have probable cause to arrest her. (Plaintiff's Opposition: pgs. 63-64). According to plaintiff, the fabricated charges violated her Fourth Amendment rights and subjected her to a malicious prosecution.  (Id). Yet, at his deposition Officer Stonfer testified that he arrested plaintiff  pursuant to City of Kansas City Ordinance, Sec. 50-168 for the crime of offensive contact[9] after taking a witness statement from Samantha Myers, and observing the event himself. (Plaintiff's Opposition: Exh. 6, pgs. 17-18). The event in question is when plaintiff was about to be released after the initial incident at the Shark Bar, she slapped a cup off of a desk which hit Ms. Myers. (Id: pgs. 20-21, 50-58).  Plaintiff does not dispute that she knocked over the cup of water because she was upset and embarrassed, but argues she should not have been arrested for this action. (Plaintiff's Opposition: Response to Defendants' SUMF: ¶¶ 5-8). Viewing the evidence in a light favorable to plaintiff, a reasonable officer, under these circumstances, could have determined probable cause existed to arrest plaintiff for violation of Ordinance 50-168. Holtgreven v. O'Fallon Police Dept., at *10 (under Missouri law, an action for false arrest or false imprisonment arises when there is confinement without legal justification by the wrongdoer of the person wronged). Thus, there is no genuine issue of material fact to support plaintiff's claims for false imprisonment and false arrest. Pitts, at 732.

As to plaintiff's malicious prosecution claim, it is well established in this circuit that an action for malicious prosecution by itself is not punishable under § 1983 because it does not

---

[9] Defined by Officer Stonfer as a minor assault charge when "something is done to somebody that doesn't cause injury to them." (Plaintiff's Opposition: Exh. 6, pg. 22).
Ordinance 50-168 reads:
    No person shall, by an intentional, overt act, attempt to unlawfully inflict a bodily injury or attempt to cause an unlawful, offensive contact upon the person of another.
(Defendants' Supporting Suggestions: Exh. D).

allege a constitutional injury. Id. Malicious prosecution can form the basis of a § 1983 claim only if defendant's conduct also infringes some provision of the Constitution or federal law. Id. Here, in determining there was probable cause for plaintiff's arrest, there is no genuine issue of material fact to support a claim for malicious prosecution.

In finding the existence of probable cause to arrest plaintiff, summary judgment is also granted as to the claims raised under state law for malicious prosecution and false arrest. Kurtz v. City of Shrewsbury, 245 F.3d 753, 757-58 (8th Cir. 2001).

C. Conspiracy

To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff. Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009); see also, White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008). The plaintiff is additionally required to prove deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim. Id. Plaintiff claims that Officers Baker and Cofield-Booker conspired to subject her to an allegedly illegal strip search. In support of this claim plaintiff contends the plan was evidenced by one officer grabbing a red hazmat bag at the booking counter and another officer running back to get gloves. Notwithstanding this purported overt act, plaintiff fails to generate a genuine issue of material fact as to the first element which is the absence of deprivation of a constitutional right.

D. Policies, Practices, and Procedures

In Count V, plaintiff alleges that the detention officers have been inadequately trained as to the difference between a strip search and clothing exchange, and they conduct strip searches

when they think they are only conducting a clothing exchange. A failure to train claim may only serve as the basis for § 1983 liability when the failure to train can be said to constitute deliberate indifference to the rights of others. Liebe v. Norton, 157 F.3d 574, 579 (8th Cir. 1998). Deliberate indifference is shown where the need for more or different training was so obvious and the inadequacy so likely to result in the violation of constitutional rights. Id. All detention center personnel agreed that under Policy 150, soiled clothing on a detainee is removed and replaced with jail-issued attire, with some limited discretion as to the quantity needed to constitute "soiled," as well as to the location of the change. The fact that a policy regarding possible hazardous material has been implemented fails to support a claim of deliberate indifference. Liebe, at 579-80.

Plaintiff also complains that the prevalent custom in the detention center is to strip female detainees in an open hallway and cites to testimony by Timothy Trainor (Supervisor, Detention Unit) that since 2009, at least two hundred women have been searched in an open hallway. However, as previously noted, plaintiff has not generated a triable issue of material fact that she was subjected to an unconstitutional strip search. In the absence of a constitutional violation, plaintiff fails to establish a claim for custom liability because she cannot demonstrate that a custom was the moving force behind a constitutional violation. Johnson v. Douglas County Medical Dept., 725 F.3d 825, 828 (8th Cir. 2013).

Consequently, summary judgment will be granted on this claim.

## II. State Law Claims

Intentional Infliction of Emotional Distress

To state a claim under this theory, a plaintiff must allege that (1) the defendant's conduct was extreme and outrageous, (2) the defendant acted in an intentional or reckless manner, (3) the

22

defendant's conduct resulted in severe emotional distress, and (4) the conduct was intended solely to cause extreme emotional distress to the victim. Pierce v. Pemiscot Memorial Health Systems, 25 F.Supp.3d 1198, 1211 (E.D.Mo. 2014); see also, Dunham v. City of O'Fallon, Mo., 945 F.Supp. 1256, 1262 (E.D.Mo. 1996). The conduct alleged must be so outrageous as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in civilized society. Id. Additionally, the plaintiff must allege that he suffers from emotional distress that is medically diagnosable and medically significant. Id.

Here, plaintiff contends that the forcible removal of her pants and underwear in the hallway at the detention center severely traumatized her and her treating psychologist confirmed that the prior feelings of anxiety were re-awakened. However, even when viewing the record in a light most favorable to plaintiff, there is no genuine issue of material fact that the conduct of Officers Baker and Cofield-Booker went beyond all possible bounds of decency. Moreover, there is nothing in the record to suggest that Officers Baker and Cofield-Booker knew of the prior rape and intended to cause plaintiff extreme emotional distress. Thus, summary judgment will be granted on this claim.

Illegal Strip Search

In Count IX, plaintiff also contends that she was subjected to an illegal strip search as defined by Missouri law in § 544.193.1(2) RSMo. A strip search has been defined by this statute as:

> The removal or rearrangement of some or all of the clothing of a person so as to permit an inspection of the genitals, buttocks, anus, breasts or undergarments of such person, including but not limited to inspections conducted visually, manually or by means of any physical instrument.

23

Once again, however, plaintiff's contention that the officers visually inspected her breasts and buttocks is not supported by the evidence. The video provided by plaintiff shows that as plaintiff removed her blouse and bra, Officer Baker held up the jail-issued blouse to shield her. (Opposing Suggestions: Exh. 4, Video #8). Even as plaintiff's pants and underwear were removed by Officer Baker – after plaintiff refused to remove these garments – the video shows that the once removed, plaintiff was immediately clothed with the jail-issued pants. (Id). There is no evidence that plaintiff was subjected to a search or inspection during this event. Schmidt v. City of Bella Villa, 557 F.3d 564, 575 (8th Cir. 2009) (plaintiff presents no evidence that the inspection of the tatoo, located on her lower stomach, was for the purpose of inspecting her underwear, nor that her underwear was inspected).

Forcibly removing plaintiff's clothes does not make the incident a strip search under state statute. Peters, 979 F.Supp.2d at, 937. Further, both the Supreme Court and the Eighth Circuit Court of Appeals have repeatedly recognized that federal courts do not look to state statutes to assess the validity of an arrest, search, or seizure under the Fourth Amendment. Id. Further, state law violations do not necessarily offend the Federal Constitution. Clay v. Woodbury, 982 F.Supp.2d 904, 924 (N.D.Iowa 2013). The Missouri statute relied on by plaintiff does not establish that she was subjected to a strip search, let alone that she was subjected to an unreasonable invasion of her Fourth Amendment privacy rights. Id.

Accordingly, it is hereby

ORDERED that the motion of attorney Dion F. Sankar for leave to withdraw as counsel for plaintiff (ECF doc. 115) is DENIED as moot. It is further

ORDERED that defendants' motion for summary judgment (ECF doc. 131) is GRANTED. It is further

ORDERED that defendants' motion for an extension of time to file their reply brief (ECF doc. 137) is DENIED as moot.

/s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

September _23_, 2015

Kansas City, Missouri